COMMONWEALTH vs. RALPH M. SNEED, JR.

Middlesex. November 7, 1978. — December 18, 1978.

Present: HENNESSEY, C.J. QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Practice, Criminal,* Fair trial, Instructions to jury, Questioning of witness by judge, Comment by judge.

A defendant in a criminal case was deprived of a fair and impartial jury trial by the judge's questioning of a defense witness concerning her failure to testify at prior District Court proceedings and otherwise eroding her credibility and by the judge's erroneous instructions to the jury, including his charges on reasonable doubt and the defendant's failure to testify on his own behalf. [869-873]

COMPLAINT received and sworn to in the Third District Court of Eastern Middlesex on May 2, 1975.

On appeal to the Superior Court, the case was tried before *Faraci,* J., a District Court judge sitting under statutory authority.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*William J. Leahy* for the defendant.

*Susan C. Mormino,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, C.J. A jury returned guilty verdicts on complaints which charged the defendant with possession of burglarious tools and unauthorized use of a motor vehicle. He appealed. The Appeals Court reversed the conviction on the complaint for possession of burglarious tools and ordered a judgment to be entered for the defendant. The Appeals Court affirmed the conviction for unauthorized use of an automobile. *Commonwealth* v. *Sneed,* 6 Mass. App. Ct. 855 (1978). This court allowed the defend-

ant's application for further appellate review of this conviction. We reverse and order a new trial, on the ground that the defendant did not have a fair and impartial trial.

The facts are as follows. On May 1, 1975, Officer Roland Anderson, a police officer in the town of Weston, was assigned to patrol in an unmarked police vehicle. He and his partner, Sergeant Robert Alenburg, were driving in an easterly direction on Route 30 when, about 1:10 P.M., he observed a late model, blue Mercedes Benz automobile (Mercedes), registration No. E-69-609, traveling in the opposite direction. Officer Anderson's attention was drawn to this vehicle because it slowed down as it approached residential driveways on Route 30. Officer Anderson called in to the police station, asking for a license check and a stolen car check.

Subsequently, Officer Anderson was notified by radio that the Mercedes had been reported as stolen. By this time the police had lost sight of the Mercedes, but they informed other police departments, by radio, of the stolen vehicle. During the next several hours the police of several cities were involved in high-speed chases of the Mercedes. Finally, the vehicle collided with a police vehicle in the town of Arlington. The two occupants of the Mercedes fled together, the defendant alighting from the door on the passenger's side. After a foot chase, the defendant was apprehended.

After the defendant was arrested, he told several police officers that he had been hitchhiking when he was picked up by the driver of the Mercedes and that he did not know the car was stolen until the chase began.

The sole defense witness was Pamela Washington, a long time friend of the defendant. Miss Washington testified that on May 1, 1975, she met the defendant in Market Square, Lynn, where they took a bus to Haymarket Square in Boston. They then took the trolley to Park Street station, where they caught the train to Harvard station. Miss Washington and the defendant shopped and walked around Harvard Square for an hour or an hour

and one-half. The defendant then tried to thumb a ride. A Volkswagen automobile stopped and, after the defendant spoke with the driver, the vehicle drove off. A Mercedes then stopped, the defendant got in it, and the car drove off. The driver of the Mercedes was a black man. Miss Washington next saw the defendant about two weeks later.

A strong argument can be made that the defendant must have a new trial because the trial judge's charge as to reasonable doubt was inadequate. It consisted of a single cryptic paragraph which simply said that the jury could return guilty verdicts if they were "morally certain, even though [they] may have some reservations" about the defendant's guilt. In the context of the entire charge, it could well be said that the instructions were correct only in their reference to moral certainty, and were so brief and casual as to trivialize the important concept of proof beyond a reasonable doubt.

We conclude that the defendant must have a new trial because the judge, in many and diverse ways, deprived the defendant of a fair and impartial jury trial. We discuss below only the most obvious illustrations of this improper intrusion.

The judge's bias is clearly shown in his handling of the witness Washington. He addressed inadmissible questions to her concerning her "failure" to testify at prior District Court proceedings. See G. L. c. 278, § 23; *Commonwealth* v. *Morrison*, 1 Mass. App. Ct. 632, 635-637 (1973). He later emphasized this "failure" in his charge to the jury. He not only admonished the witness as to perjury, presumably outside the hearing of the jury, but also threatened to hold defense counsel in contempt of court when counsel suggested that the jury, before they were excused from the court room, might have heard part of the colloquy between the judge and witness, and that the jurors should be questioned as to that possibility. In our view, the circumstances were such that the jury were probably aware that the judge did not believe the witness.

The judge's participation in all of this showed his disregard for the concept that any judicial comment is likely to be accorded substantial weight by the jury. *Quercia* v. *United States*, 289 U.S. 466, 470 (1933). *Commonwealth* v. *Hanscomb*, 367 Mass. 726, 732 (1975) (Hennessey, J., concurring). See *Commonwealth* v. *Festa*, 369 Mass. 419, 422-423 (1976). It is reasonable to assume, and almost inescapable, that he unjustifiably intimidated the witness (see *Webb* v. *Texas*, 409 U.S. 95 [1972]) and severely eroded her credibility. See *Commonwealth* v. *Festa, supra; United States* v. *Hill*, 332 F.2d 105, 106 (7th Cir. 1964).

The judge's partiality here is also transparent in his instructions to the jury. The role of the trial judge is that of an impartial arbiter and not that of a prosecutor. Apart from his duty to instruct the jury on the applicable law, a judge may state the evidence and discuss possible inferences therefrom. *Commonwealth* v. *Binkiewicz*, 342 Mass. 740, 750-753 (1961). *Cahalane* v. *Poust*, 333 Mass. 689, 692-693 (1956). *Commonwealth* v. *Barry*, 9 Allen 276, 279 (1864). He may not, however, directly express an opinion on the credibility of particular witnesses, *Commonwealth* v. *Binkiewicz, supra* at 753; *Commonwealth* v. *Barry, supra; Commonwealth* v. *Perry*, 3 Mass. App. Ct. 308, 311 (1975), nor may he instruct the jury that they must draw particular inferences from the evidence, *Commonwealth* v. *Therrien*, 371 Mass. 203, 207 (1976); *Commonwealth* v. *Cote*, 5 Mass. App. Ct. 365, 369-370 (1977). In disregard of these principles, the judge here adopted the role of an advocate. We assume that he was convinced of the defendant's guilt on the weight of the evidence, but that state of mind called for judicial restraint which he did not exercise.

The defendant is entitled to relief here even though his exceptions were recorded to the judge's "charge as a whole." Ordinarily such a general exception brings nothing before us on appeal. *McKnight* v. *Red Cab Co.*, 319 Mass. 64, 66-67 (1946). However, in this case the charge was so permeated with error that we think this is the rare

case where a general exception was sufficient. We observe also that a previous colloquy in which defense counsel tried to save his client's rights had resulted in a totally unwarranted threat by the judge to hold defense counsel in contempt of court.

It is perfectly clear and beyond all argument that reversal of these convictions is required by reason of the judge's language in his instructions on the defendant's failure to testify. No aspect of the charge to the jury requires more care and precise expression than that used with reference to the right of a defendant in a criminal case to remain silent and not be compelled to incriminate himself, as provided in art. 12 of the Declaration of Rights of the Massachusetts Constitution and the Fifth Amendment to the Constitution of the United States. Even an unintended suggestion that might induce the jury to draw an unfavorable inference is error. *Commonwealth v. Maloney*, 113 Mass. 211, 214 (1873). *Commonwealth v. Harlow*, 110 Mass. 411, 412 (1872). Instructions which adhere to the letter, but not the spirit, of these protections, are cause for reversal. *Brown v. Commonwealth*, 335 Mass. 476, 481-482 (1957). The instructions must thoroughly protect the defendant against any prosecutor's argument, or intimation by the judge, that the defendant is invoking constitutional rights to conceal or deceive.[1] See *Commonwealth v. Gouveia*, 371 Mass. 566, 570-571 (1976); *Commonwealth v. Borodine*, 371 Mass. 1, 9-12 (1976); cert. denied, 429 U.S. 1049 (1977); *Commonwealth v. Domanski*, 332 Mass. 66, 69 (1954); *Commonwealth v. Costello*, 5 Mass. App. Ct. 838 (1977).

---

[1] Some judges prefer to address the privilege without mentioning the Constitution at all, but speak in terms of the burden of proof, viz.: that the law places the burden of proving all elements of the crime, beyond a reasonable doubt, on the Commonwealth; and that the defendant, as is his privilege, left the burden there and chose not to testify. Some judges are careful also to consult with the defense as to whether the privilege is to be mentioned at all, and then are guided by the defendant's request as to the question.

If we assume that the judge here sought to protect the defendant's constitutional interests, it is difficult to conceive of language which could strike so wide of the well-intentioned goal. In timing, sequence, and words, the results were abortive. The charge as to the defendant's decision not to testify was given immediately after the main charge and the defendant's exception thereto. At that time defense counsel made no request for additional instructions to the jury. The judge then prefaced a supplementary instruction by the comment that it was being made "so that the defendant will not say that I violated any of his rights." The actual instruction consisted of a single sentence: "He didn't take the stand, as you noticed, and that's his constitutional right, and we ask the jury not to draw any inference from his *refusal* to take the stand" (emphasis added). Immediately thereafter, the judge asked defense counsel in the presence of the jury, "Do you want to object to that, counsellor?" Counsel did then request that the defendant's exception be noted, and the judge further instructed the jury to "disregard what I just said so there won't be any exceptions." The specific instruction, moreover, was preceded by a remark in the main charge that the defendant "has availed himself of every constitutional right." The judge in his charge had also made a comment as to the defendant's silence: "I won't say anything about the fact that he sits here and it was within the knowledge of the defendant."

We conclude that the words of the judge, in total, could hardly have had anything other than a prejudicial effect on the jury, and that the defendant's constitutional privilege was in a practical sense converted to a detriment.

Although a judge may state the evidence and discuss the possible inferences, this judge ignored the necessity for careful even-handedness required in such an exercise. The most striking example of this can be found in his instructions as to the overriding issue whether the defendant knew the automobile was being used without authority. In view of all we have said above, as to govern-

ing principles, we think it sufficient to set out this portion of the charge without further comment from this court: "So you start out in the case, you say to yourselves, first of all, how many people own a Mercedes Benz? I daresay without attempting to insult anybody here, I don't believe any of you members of the jury own a Mercedes Benz. Perhaps you do - at least, I know I don't. How many people own a Mercedes Benz? Here is a fellow who wants to tell you that he was hitchhiking—a Volkswagen comes by—that's not good enough for him—he has got to wait for a Mercedes Benz—and, Mr. Foreman, and members of the jury, who is operating this Mercedes Benz? Some well-dressed professional man or this young man that happens to have a black cap on? . . . Could you draw a reasonable inference that perhaps this kid didn't own that Mercedes Benz? That's up to you, Mr. Foreman, and members of the jury. . . . Don't you think in a period of two hours the defendant might have got the idea that perhaps this operator . . . did not own that Mercedes Benz? And if you draw that inference, you have to draw the inference of knowledge, and you have to find the defendant guilty—taking it together with the fact that on several occasions after a high speed chase, the defendant should have known something was wrong. . . . If you didn't want to stay in that car . . . isn't it reasonable to assume if the car came to a complete stop, you would have walked out? There is an old axiom in the law that says, flight can be an admission of guilt. And after this accident took place, he didn't stay there and say, 'Hey, look, I'm only an innocent by-stander, I'm only an innocent hitchhiker.' He took off with the other guy and went over fences, one four-foot fence and another ten-foot fence. The law says you can use that to draw an inference that the flight was somewhat of an admission of guilt."

The judgment is reversed, the verdict set aside, and the case is remanded to the Superior Court Department for a new trial.

*So ordered.*