HERSEY, Chief Judge.
In the execution of a search warrant after a “controlled buy,” law enforcement officers forced their way into the home of Sarah Davis. On the premises they found contraband drugs and paraphernalia, as well as the currency which is the subject matter of these forfeiture proceedings.
The leading issue in this appeal from the order granting forfeiture is whether there was compliance with the “knock and announce” statute and, if not, whether entry was permissible under one of the exceptions to this statutory requirement.
The “knock and announce” rule, embodied in section 933.09, Florida Statutes (1985), provides:
Officer may break open door, etc., to execute warrant. — The officer may break open any outer door, inner door or window of a house, or any part of a house or anything therein, to execute the warrant, if after due notice of his authority and purpose he is refused admittance to said house or access to anything therein.
We recently had occasion to explore the purpose and history of “knock and announce” in Van Allen v. State, 454 So.2d 49 (Fla. 4th DCA 1984), rev. denied, 462 So.2d 1108 (Fla.1985). See also Benefield v. State, 160 So.2d 706 (Fla.1964), from which we quote in Van Allen. We will not here repeat what we said there.
Sarah Davis was asleep in her bedroom when several deputies from the Broward County Sheriff’s Office arrived at her home to execute the search warrant. Three deputies positioned themselves at what appears to have been the front door and it is from that vantage point that entry was gained. Relevant to the issue of compliance with the knock and announce requirement Deputy John Beach testified as follows:
Q Did anybody knock on the door?
A I did.
*701 Q All right. Did you — how many times did you knock?
A I don’t recall how many times I knocked.
Q Was it more than once?
A Again, I don’t — knock, knock, knock, knock, did something like that, except with the base of my hand.
Q Was it as loud as what you just knocked?
A I would have to say maybe a little louder.
Q Did you announce your presence?
A Somebody answered the door, said who's there.
Q And what response if any was given?
A I said the Sheriff’s Office.
Q In what type of voice?
A I don’t know. Say a loud voice, Sheriff’s Office.
Q Was it as loud as you are talking?
A No, sir. I probably said it a little louder.
Q What response was obtained after you announced yourself as the Sheriff’s Office?
A I don’t recall any response, except I heard the sound of people scurrying about inside.
Q And after you heard that, what action if any did you take?
A I promptly removed the door with about a ten or twelve pound sledge hammer.
Q Who did the swinging?
A I did.
Q Did the door give in?
A Yes, sir, ultimately it did.
Q Well, did you hit it more than once?
A A number of times.
Q Did anyone ever respond saying, hey, don’t do that, we’re coming, we’re at the door, any words to that effect?
A Not that I recall, no, sir.
Detective Eugene McCloud testified as follows:
Q When you went in the house do you recall whether or not anybody knocked and announced themselves?
A Yes.
Q Who did that?
A Detective John Beach.
Q What was it that Detective Beach said?
A He announced that we were Broward Sheriff’s Office, and we have a search warrant.
Q Were you outside when that occurred?
A Yes.
Q What happened after that?
A About ten to fifteen seconds — after not getting any response after about ten to fifteen seconds we knocked again.
Q What happened?
A We announced our authority.
Q Who did that?
A Detective John Beach.
Q You’re right there?
A Yes.
Q Now, when you say knock, is it a little, itty bitty tap or is it a fairly assertive knock?
A Yes, a very assertive knock, I would say.
Q You heard it?
A Yes.
Q Ultimately did someone answer the door?
A No.
Q How did you all get in?
A I think with the use of a sledge hammer.
Q Who was the fortunate soul that got to swing the sledge hammer?
A I believe it was Detective John Beach.
Q Did that work?
A Yes.
Q You got in?
A Yes.
Q Tell me what you saw when you got in.
A Well, people.
Q How many?
A I don’t recall how many.
Q More than one?
A There were approximately I would say about four to five people.
Q Adults?
*702 A Adults and kids.
Appellant characterizes the officers’ testimony as “conflicting.” The variations between their testimony is more accurately explained as resulting from failure to ask the right questions and the fact that one officer heard things the other did not. Given the passage of time and the fact that law enforcement officers participate in a great many searches, arrests and the like, it is neither surprising nor blameworthy that they do not retain a crystal-clear recollection of every detail of a particular incident.
Moreover, there were several adults and some children present during this incident. Some of them were heard to be “scurrying about” after the first knock. Surely if there was even a scintilla of doubt about the accuracy of the officers’ account of their compliance with the “knock and announce” statute, the $70,000 at stake in these forfeiture proceedings would have been sufficient incentive for appellant to have produced a witness to say so. In fact, only appellant testified, and she was unable to shed any light on the details of the entry in view of her testimony that “I was asleep.” Based on the testimony, the demeanor of the witnesses and other factors, the trial court found compliance with the statute. We give the factual aspects of that determination the usual deference. The only question is whether, as a matter of law, the manner of compliance with the statute fell short of constitutional requirements. We hold that it did not.
Finding no merit in appellant’s additional points on appeal, we affirm.
AFFIRMED.
GLICKSTEIN and WALDEN, JJ., concur.